UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LAQUAN PERKINS,                          )
                                         )
                    Plaintiff,           )
                                         )
vs.                                      )   Case No. 3:21-cv-00711-GCS
                                         )
CHRISTINE BROWN,                         )
                                         )
                    Defendant.           )

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

### INTRODUCTION

Now pending before the Court is Defendant Christine Brown's motion for summary judgment. (Doc. 63, 64, 77).[1] Defendant Brown argues that she is entitled to summary judgment in that she lacks personal involvement to be held liable under 42 U.S.C. § 1983; that no reasonable jury could conclude that Plaintiff's medical care constituted deliberate indifference; and that she is entitled to qualified immunity. Plaintiff opposes the motion arguing that according to the Illinois Department of Central Case Management Services, Defendant Brown has the sole authority to approve or deny

---

[1]     Along with the motion for summary judgment, Defendant Brown filed the required Federal Rule of Civil Procedure 56 notice informing Plaintiff of the consequences of failing to respond to the motion for summary judgment and what is required in responding to a motion for summary judgment. (Doc. 65).

treatment. (Doc. 74). For the reasons set forth below, the Court **GRANTS** the motion for summary judgment.

Plaintiff Laquan Perkins, an inmate of the Illinois Department of Corrections ("IDOC") who is currently incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff filed his complaint on June 25, 2021. (Doc. 1). On February 6, 2020, Plaintiff alleged he was transferred to an outside hospital for dental work to have his #32 lower, right wisdom tooth extracted. *Id.* at p. 6. He was warned by the oral surgeon that he might lose sensation in his tongue and lip. He was provided with pain medication and transferred back to Pinckneyville. Once the pain medication wore off, however, Plaintiff had no feeling in the right side of his face, including his right eye. *Id.* at p. 7. He also could not hear out of his right ear. *Id.*

On February 20, 2020, Plaintiff was transferred back to the hospital for complaints of loss of feeling, diminished eyesight, and loss of hearing. (Doc. 1, p. 7). The oral surgeon informed Plaintiff that the issues were unrelated to his surgery, and he was referred to a neurologist. From February 18, 2020, to October 19, 2020, Plaintiff submitted twelve sick call slips seeking care for the issues with his face. *Id.* He asserted that he received no medical care. He informed Defendant Brown of his issues, but she refused to provide any additional care. *Id.* Plaintiff continues to suffer from loss of facial sensation, diminished eyesight, and hearing in his right ear, which he fears might be permanent. *Id.* at p. 8.

On December 7, 2021, the Court conducted a preliminary review of the complaint

pursuant to 28 U.S.C. § 1915A and allowed Plaintiff to proceed on an Eighth Amendment deliberate indifference claim against Defendant Brown for failing to provide him with care for his loss of facial sensation and issues with his eyesight and hearing. (Doc. 11).

## FACTS

The following facts are taken from the record and presented in the light most favorable to Plaintiff, the non-moving party, and all reasonable inferences are drawn in his favor. *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

Plaintiff has been incarcerated in Pinckneyville since December 14, 2016. Defendant Christine Brown served as the Healthcare Unit Administrator ("HCUA").

On February 6, 2020, Plaintiff went to an outside hospital for dental work to have his #32 lower, right wisdom tooth extracted. After submitting a sick call request, Plaintiff was seen by medical staff the next day for complaints of a swollen jaw and a numb lip. The medical staff added Plaintiff to the dental line on February 10, 2020. Thereafter, on February 19, 2020, Plaintiff saw medical for an earache. During this visit, Plaintiff stated that he has had numbness to the right side of his face since his oral surgery, and he could not hear out of his right ear. The medical provider noted that Plaintiff had an appointment with the oral surgeon the next day. Plaintiff saw the oral surgeon on February 20, 2020. The oral surgeon opined that it was impossible to have numbness as reported from the oral surgery.

Plaintiff's medical records indicate that on February 19, 2020, Plaintiff was approved in urgent collegial for a return to the oral surgeon for the pain, tingling, and numbness the Plaintiff was experiencing after the oral surgery on February 6, 2020.

Subsequently, on February 27, 2020, Plaintiff saw a medical doctor for complaints of pain, tingling, and numbness to his face. The doctor noted that Plaintiff was scheduled to see the surgeon.

On March 17, 2020, Plaintiff submitted two nurse sick slip calls. One complained about his right eye, and the other complained that he still could not hear out of his right ear. A week later, Plaintiff was seen on the nurse practitioner line for the numbness to the right side of his face. The provider made notations about Plaintiff's movement ability in his face, *inter alia*, that Plaintiff had no feeling with touch of face, ear/check, hearing, and smell and advised him to return to nurse sick call as needed. Two days later, Plaintiff was referred to neurology based on the loss of facial sensation.

On April 2, 2020, collegial approved Plaintiff for a neurology exam to be scheduled after the Covid-19 "shut in." Thereafter, on April 6, 2020, Plaintiff submitted a nurse sick call request slip stating that it had been two months, and he still had not been seen about his right ear or about his facial numbness. Plaintiff was seen again by the LPN regarding his face/ear problems on April 8, 2020. During this visit, Plaintiff was informed of the collegial approval to see a neurologist once the Covid-19 precautions were lifted.

On May 18, 2020, Plaintiff saw a registered nurse and asked about when he would be seen by the neurologist. During this visit, Plaintiff did not report any new symptoms.

The RN told Plaintiff that the appointment would be scheduled after the Covid-19 precautions were lifted. On May 30 and 31, 2020, Plaintiff submitted two nurse sick calls slips. One stated that his gums were red, that his gums had sores, and that he could not eat. The other stated that he ate something he was allergic to, that he had burns in his mouth, and that he could not eat.

Again, Plaintiff was seen in the healthcare unit for numbness in his face on June 1, 2020. He was told that an appointment would be scheduled when the Covid-19 precautions were lifted. On June 30, 2020, Plaintiff submitted two nurse sick call slips for the numbness to the right side of his face and his right ear. In one of the sick call slips Plaintiff asked why he had been waiting six months to see a doctor.

Plaintiff submitted another nurse sick call slip on August 2, 2020, stating that it had been six months since his tooth was pulled, that he still could not feel the right side of his face, and that he could not hear. He also asked for help.

The next day, Plaintiff saw medical staff for concerns that he had not been seen by a neurologist for his facial numbness. The LPN observed Plaintiff's face was equal on both sides, with no drooping, his eyes were equal, and there was no slurring of speech. The LPN advised Plaintiff that he had been approved and was waiting on the Covid-19 precautions to be lifted. The LPN also referred Plaintiff for a hearing test.

On August 6, 2020, Plaintiff was seen by an outside neurologist for an evaluation.

On August 25, 2020, the medical records reflect a review on the official transcript for a neurology exam conducted on August 24, 2020. The records further reflect the

neurologist requested an MRI, audiology, and labs, all of which were ordered, and the matter was referred to collegial. Thereafter, on August 26, 2020, Plaintiff was referred to neurology for a follow-up in three months. He was also referred to radiology for a brain MRI.

On September 4, 2020, Plaintiff again saw medical for facial numbness and was advised that they were waiting for collegial approval. On or about September 9, 2020, collegial approved Plaintiff for an audiology evaluation and a neurology evaluation. The labs that were previously ordered were completed on September 10, 2020. Subsequently, on September 22, 2020, Plaintiff went on a medical furlough for his brain MRI.

In the later part of October 2020, Plaintiff submitted two more nurse sick call slips complaining of facial numbness and loss of hearing out of his right ear. In one of the slips, Plaintiff stated that he needed help. On October 20, 2020, Plaintiff was seen by a nurse practitioner for complaints of facial numbness. The nurse practitioner noted that Plaintiff was currently following up with neurology, and he was approved in collegial. On October 21, 2020, Plaintiff saw medical staff for his facial numbness and ear pain.

Plaintiff's medical furlough was rescheduled due to the Covid lockdown on December 11, 2020.

Again, on February 6, 2021, Plaintiff submitted a nurse sick call request slip for facial numbness and loss of hearing. The nurse sick call slip asked for help and stated that it had been a year.

On March 9, 2021, Plaintiff was sent on a medical furlough to neurology and was submitted to collegial for the follow-up MRI requested by the neurologist. Two weeks later, Plaintiff was referred to audiology for hearing loss in his right ear and complaints of no sensory innervation in his right face. He was also referred to ophthalmology for complaints of loss of vision following dental work. Collegial approved Plaintiff for an ophthalmology evaluation and a hearing test.

On April 5, 2021, Plaintiff submitted another nurse sick call slip complaining that he could not hear out of his right ear and that his left ear was getting low. He also asked for help and stated it had been a year. The next day, Plaintiff was seen by medical staff regarding non-specific discomfort and clogged/decreased sound; he was observed to have visible wax and was given something to use for the wax build up. Then, on April 9, 2021, Plaintiff saw a doctor for complaints of difficulty hearing. The doctor ordered Plaintiff to be scheduled for a hearing test.

In the beginning of May 2021, Plaintiff went on a medical furlough to the ophthalmologist. Upon return, he complained of vision loss throughout the day and was submitted to collegial for a carotid doppler study. He was also given a hearing evaluation/test. Subsequently, collegial approved Plaintiff for a carotid doppler on May 13, 2021, and on May 26, 2021, Plaintiff went on a medical furlough for the carotid doppler study. Upon return, Plaintiff was submitted for approval for an ECHO. Plaintiff was referred to cardiology for an ECHO based on recommendation following the completed carotid doppler study.

In early June 2021, collegial approved Plaintiff for the ECHO. On June 17, 2021, Plaintiff was sent on another medical furlough to the neurologist. When Plaintiff returned, he stated that he was not sure where or why he went. The doctor noted they would contact neurology and obtain notes regarding the furlough. During this visit, the provider noted that malingering or conversion disorder was suspected. Plaintiff received his ECHO from SIH Memorial Hospital on June 22, 2021.

Thereafter, Plaintiff refused to be seen on the MD call line on August 6, 2021.

On October 8, 2021, Plaintiff had a hearing evaluation, and on October 13, 2021, collegial approved Plaintiff for an audiology and ENT.

At the end of November 2021, Plaintiff went on a medical furlough to the ENT. Upon return, the doctor submitted Plaintiff to collegial for MRI-IAC.

Plaintiff had the MRI due to hearing loss on January 14, 2022. The doctor noted that Plaintiff would need to be approved for a hearing aid. Plaintiff received the hearing aids in March/April 2022.

Plaintiff never personally spoke to Defendant Brown about being seen by an outside medical provider. However, he thinks that she is responsible for that approval because her name is on some of the medical paperwork. Plaintiff did not receive medical care from Defendant Brown. Further, Plaintiff has no knowledge of whether Defendant Brown has any authority over the doctors, dentists, and/or nurse practitioners to prescribe a certain course of treatment. Plaintiff does not recall any medical professional ever telling him that his injuries were caused by a delay in treatment. Plaintiff does not

have medical training.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. PROC. 56(a)). *Accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681-682 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party. *See Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, and as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## DISCUSSION

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious

medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–653 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)) (internal quotation marks omitted). *Accord Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 828 (7th Cir. 2009) (stating that "deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm—not to demand specific care. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail on such a claim, a prisoner who brings an Eighth Amendment challenge of constitutionally deficient medical care must satisfy a two-part test. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first prong is whether the prisoner has shown he has an objectively serious medical need. *See Arnett*, 658 F.3d at 750; *accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted).

The second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *See Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either knowingly or

recklessly disregarded it. *See Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

"Negligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is

not enough." *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987) (citation omitted). Also,

"mere disagreement with the course of the inmate's medical treatment does not constitute

an Eighth Amendment claim of deliberate indifference." *Snipes v. DeTella*, 95 F.3d 586,

591 (7th Cir. 1996) (internal quotations and citations omitted).

A delay in treatment can rise to the level of deliberate indifference if the plaintiff

presents medical evidence that the delay "exacerbated the inmate's injury or

unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-778 (7th Cir. 2015)

(citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) and *Edwards v. Snyder*, 478 F.3d

827, 831 (7th Cir. 2007)); *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013). The Eighth

Amendment does not require that prisoners receive "unqualified access to health care[.]"

Rather, they are entitled only to "adequate medical care." *Johnson v. Doughty*, 433 F.3d

1001, 1013 (7th Cir. 2006). Mere disagreement or dissatisfaction as to the treatment

received does not amount to deliberate indifference. *See Edwards v. Snyder*, 478 F.3d 827,

831 (7th Cir. 2007); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Ciarpaglini v. Saini*,

352 F.3d 328, 331 (7th Cir. 2003); *Snipes*, 95 F.3d at 592.

In a Section 1983 case, a defendant also cannot be held liable via the doctrine of

*respondeat superior*. *See Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). To be held

individually liable, a defendant must have personal responsibility for the violation of a

constitutional right. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). The

Page **11** of **16**

personal liability requirement of Section 1983 can be satisfied by showing that the constitutional deprivation occurred at an official's direction or with his knowledge and consent. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In short, some causal connection or affirmative link between the action complained about and the official sued is necessary to recover under Section 1983. *Id.*

For the purposes of this motion and based on the record before the Court, the Court finds that Plaintiff's loss of facial sensation and issues with his eyesight and hearing constitute objectively serious medical needs. However, based on that same record and construing the evidence in the light most favorable to Plaintiff, the Court finds that there is no evidence in the record to support Plaintiff's claims of deliberate indifference, or that Defendant Brown was personally involved in the Plaintiff's medical treatment.

As demonstrated in the undisputed fact section above, Plaintiff, from February 2020 through January 2022, received continuous on-going medical treatment for his complaints of facial numbness and the issues with his eyesight and hearing loss following his oral surgery on February 6, 2020. The record is replete with several visits with medical staff at Pinckneyville, various collegial approvals, and many medical furloughs for outside treatment for Plaintiff's complaints. In fact, Plaintiff was seen inside the facility at least 12 times, Plaintiff was approved by collegial for various treatments at least 6 times, and Plaintiff was sent on medical furloughs for oral surgery, a neurology exam, a brain MRI, 2 neurology visits, an ophthalmologist, a carotid doppler, ECHO, ENT for audiology, and an MRI due to hearing loss. Thus, there is no evidence that the medical

decisions/treatment plans given to Plaintiff were such a substantial departure from accepted professional judgment, or so plainly inappropriate, as to permit the inference that medical staff intentionally or recklessly disregarded Plaintiff's serious medical needs. Further, Plaintiff admitted that he cannot recall any medical professional telling him that his injuries were caused by a delay in treatment. Additionally, if there was any delay in treatment, which the Court finds questionable, it appears that it was due to the Covid-19 pandemic, and not due to the conduct of the various medical treatment providers. The medical staff and the doctors exercised their professional judgment and provided Plaintiff with proper care based on the circumstances. Thus, Defendant Brown is entitled to summary judgment on Plaintiff's deliberate indifference claim against her.

Assuming, *arguendo*, that Plaintiff did establish a claim of deliberate indifference, which he certainly did not for the reasons stated *supra*, the Court finds that Defendant Brown was not personally involved in Plaintiff's medical care and cannot be held liable. First, Plaintiff admitted that he never received medical care from Defendant Brown. Second, Plaintiff also admitted that he had no knowledge of whether Defendant Brown had any authority over any of the doctors, dentists, and/or nurse practitioners to prescribe a certain course of treatment. Lastly, Plaintiff admitted that he never personally spoke to Defendant Brown about being seen by an outside medical provider. Thus, Plaintiff has not established that Defendant Brown was personally involved in his medical care. In light of the above, the Court need not address Defendant Brown's

argument regarding qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Brown's motion for summary judgment. (Doc. 63). The Court **DIRECTS** the Clerk of the Court to enter judgment in favor of Defendant Christine Brown and against Plaintiff Laquan Perkins and close the case.

In an abundance of caution, and noting Plaintiff's *pro se* status, the Court advises Plaintiff as follows. Plaintiff has two means of contesting this order: (1) he may request this Court review this order; or (2) he may appeal the order to the Seventh Circuit Court of Appeals.

If Plaintiff chooses to request this Court to review this order, he should file a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e). Plaintiff *must* file the motion within twenty-eight (28) days of the entry of judgment; the deadline *cannot* be extended. *See* FED. R. CIV. PROC. 59(e); 6(b)(2). The motion must also comply with Rule 7(b)(1) and state with sufficient particularity the reason(s) that the Court should reconsider the judgment. *See Elustra v. Mineo*, 595 F.3d 699, 707 (7th Cir. 2010); *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 760 (7th Cir. 2001). *See also Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 598 (7th Cir. 2012) (stating that a party must establish either manifest error of law or fact, or that newly discovered evidence precluded entry of judgment to prevail on a Rule 59(e) motion) (citation and internal quotation marks omitted).

So long as the Rule 59(e) motion is in proper form and timely submitted, the 30-day clock for filing a notice of appeal will be tolled. *See* FED. R. APP. PROC. 4(a)(4). The clock will start anew once the undersigned rules on the Rule 59(e) motion. *See* FED. R. APP. PROC. 4(a)(1)(A), (a)(4), (a)(4)(B)(ii). However, if the Rule 59(e) motion is filed outside the 28-day deadline or "completely devoid of substance," the motion will not toll the time for filing a notice of appeal; it will expire 30 days from the entry of judgment. *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 826 (7th Cir. 2014); *Martinez v. Trainor*, 556 F.2d 818, 819–820 (7th Cir. 1977). Again, this deadline can be extended only on a written motion by Plaintiff showing excusable neglect or good cause.

In contrast, if Plaintiff chooses to go straight to the Seventh Circuit, he must file a notice of appeal from the entry of judgment or order appealed from *within 30 days. See* FED. R. APP. PROC. 4(a)(1)(A) (emphasis added). The deadline can be extended for a short time only if Plaintiff files a motion showing excusable neglect or good cause for missing the deadline and asking for an extension of time. *See* FED. R. APP. PROC. 4(a)(5)(A), (C). *See also Sherman v. Quinn*, 668 F.3d 421, 424 (7th Cir. 2012) (explaining the good cause and excusable neglect standards); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 807 (7th Cir. 2011) (explaining the excusable neglect standard).

Plaintiff may appeal to the Seventh Circuit by filing a notice of appeal in this Court. *See* FED. R. APP. PROC. 3(a). The current cost of filing an appeal with the Seventh Circuit is $605.00. The filing fee is due at the time the notice of appeal is filed. *See* FED. R. APP. PROC. 3(e). If Plaintiff cannot afford to pay the entire filing fee up front, he must file a

motion for leave to appeal *in forma pauperis* ("IFP motion"). *See* FED. R. APP. PROC. 24(a)(1).

The IFP motion must set forth the issues Plaintiff plans to present on appeal. *See* FED. R.

APP. PROC. 24(a)(1)(C). If Plaintiff is allowed to proceed *in forma pauperis* on appeal, he

will be assessed an initial partial filing fee. *See* 28 U.S.C. § 1915(b)(1). He will then be

required to make monthly payments until the entire filing fee is paid. *See* 28 U.S.C. §

1915(b)(2).

      **IT IS SO ORDERED.**

      **DATED:   April 25, 2024.**

Digitally signed by
Judge Sison
Date: 2024.04.25
12:25:20 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**